[No. 1538.]

H. C. CLAYTON *alias* COBB *v.* THE STATE.

1. THEFT—PRACTICE—CHARGE OF THE COURT.—While it is true that circumstantial evidence cannot, ordinarily, be relied upon to prove the guilt of a defendant where direct testimony is attainable, still when, as in this case, it is shown that direct testimony cannot be produced, and the failure to produce it is not attributable to any want of diligence or fault of the prosecution, it is competent to resort to circumstantial evidence. See circumstances in a theft case where the prosecution was properly allowed to prove the want of the owner's consent to the taking by circumstantial evidence, and for a charge of the court in harmony with this principle.

2. SAME.—That the defendant purchased the alleged stolen animal was a defense set up, and it was supported by direct evidence. uncontradicted by any positive evidence on the part of the State. Upon this issue the trial court charged: "In order to constitute the crime of theft there must be a fraudulent taking, and if you believe from the evidence that defendant purchased said horse from one R. in good faith, without any intent on his part to deprive the owner of the value of the same, then in in such case the taking under such circumstances would not be fraudulent; and if you find that such purchase, if any, of said horse by defendant was honestly made, and was not a device to cover a fraudulent transaction, then you will acquit." *Held*, that a purchase is not a taking within the meaning of the statute, and it was error to charge that a purchase in good faith, etc., would not be a fraudulent taking, because this implied that a purchase in bad faith might be such a taking, though the defendant had no complicity in the actual taking.

3. SAME.—The proper charge upon this issue would have been that if defendant, without complicity in the taking, purchased the horse from R.

after it had been stolen by R. or some other person, then the defendant should be acquitted. This doctrine obtains in theft, because, in order to constitute the defendant guilty of theft, he must be shown to have been a party to the fraudulent *taking*.

APPEAL from the District Court of Bell. Tried below before the Hon. B. W. Rimes.

The conviction in this case was had upon an indictment charging the appellant with the theft of a horse, the property of Mrs. Louisa Turnbo. The offense was alleged to have been committed on the fifth day of August, 1883, and the venue was laid in Bell county. The punishment awarded by the jury was a term of five years in the penitentiary.

Isaac Williams was the first witness for the State. He testified that he lived in Belton, Bell county, Texas. He had some business transactions with the defendant on the fifth day of August, 883. The defendant had a mare sold at auction on that day, which the witness purchased. Mr. Wolf, the auctioneer, wrote the bill of sale upon the request of the defendant, who said he could not write. He said, however, that his name was H. C. Clayton, and directed Mr. Wolf to sign that name to the bill of sale for him; to which he appended his mark. This being done, Mr. Wolf signed the bill of sale as a witness.

After the witness had paid for the mare and received the bill of sale, the defendant told the witness that he had another horse he wanted to sell. Witness, defendant and Wolf then went together to the creek, some distance off, where they found a horse tied to a tree. He was a slim, black, unbroken colt, two years old past, with a white star in the forehead, one white hind foot and a nicked tail. Witness offered defendant fifteen dollars for the animal, which he accepted, and he requested Wolf to write the bill of sale. Wolf wrote the bill of sale, signed the name of H. C. Clayton to it, the defendant made his mark, and witness took the horse, after paying defendant the amount agreed upon. The defendant said that the horse was his property, and was raised near Corn Hill, on Berry's creek in Williamson county; that he, defendant, lived in Williamson county. He warned the witness that if the horse got loose he would go back to his range near Corn Hill. Witness did not remember the brand on the animal, but the identical horse sold him by defendant was proved away from witness by W. C. Turnbo and Robert McBride, as the property of Mrs. Louisa Turnbo, early in September, 1883. At

the request of the grand jury, the witness made diligent search for the bill of sale of the horse executed to him by defendant, but failed to find it, the same having been lost. Witness purchased the horse from the defendant in Bell county, Texas, on the fifth day of August, 1883. The mare he bought at auction on the same day was also proved away from the witness.

W. C. Turnbo was the second witness for the State. He testified that he was the son of Mrs. Louisa Turnbo, the owner of the horse he recovered from the witness Williams. Mrs. Turnbo was very old and feeble; had been an invalid for years, and unable to leave the house. For the past several years witness had attended to her stock matters, trading and selling her stock for her, and she had never, in that time, traded or sold any stock except through the agency of the witness. The last time the witness saw the horse involved in this controversy, prior to recovering him from Williams in Belton, was on the range in Williamson county, in the spring of 1882. He was then branded E. When the witness recovered him, he found that the brand had been transformed into a B enclosed in a square. Witness did not, of his own knowledge, know who affixed the E brand on the colt, but did know that John Riggs had been authorized by his, witness's, mother to brand her Williamson county stock in that brand. Witness did not know H. C. Clayton, but did know the defendant, whose proper name is Clayton Cobb. Witness went to school with him. He lived in Williamson county, some twenty miles distant from the witness's house.

After the witness heard that the horse was missing from his accustomed range, he hunted him for some time, and finally, by accident, found him in the possession of Mr. Williams, in Belton, who told witness that he got the horse from Clayton. Witness then returned to Williamson county and got Robert McBride to go with him to Belton and prove the animal. Clayton Cobb, the defendant, was at the house of witness in August, 1882, but no talk ensued about trading stock. Witness had never seen defendant at his, witness's, mother's house. Witness had never consented to the taking of the horse by defendant or other person. His mother had never consented to any trade, sale, transfer or taking of her stock except through the witness. The animal involved in this proceeding was a black two year old horse, nicked tail, with a white star in the forehead and a white hind foot. Witness recovered him from Isaac Williams, in Belton, Bell county, early in September, 1883. Witness knew Jack

Radcliff, a brother-in-law to defendant, but did not know his present whereabouts. He had seen Radcliff with a few ponies, but did not know his brand.

Robert McBride was the third witness for the State. He testified that he knew both W. C. Turnbo and the defendant, Clayton Cobb. Early in September, 1883, witness accompanied Turnbo to Belton to prove his mother's horse from Isaac Williams. Witness had known this horse since he was a sucking colt. He run with a small bunch of Mrs. Turnbo's horses, near the place of the witness's father. They ranged from near Major Carter's, in Williamson county, to the head of the Salado. When this animal was a young colt he was branded E by John Riggs for Mrs. Turnbo. Witness saw the animal on the range regularly until the spring of 1883, when óne day he noticed that the E brand had been burned out. The burning was then fresh, and the brand had not peeled. The fresh brand looked like a B in a square. After observing that the brand had been changed, the witness watched the horse, and missed him from the range about two months before he was found at Williams's, in Belton. Witness was positive that this was the same animal, which, as a colt, sucked Mrs. Turnbo's mare. Witness knew him as a colt, and he could not be mistaken. Defendant lived about ten miles from the range on which the horse usually ran. Witness knew Mrs. Louisa Turnbo well. Her son, W. C. Turnbo, has sold and traded her stock for her for several years. Mrs. Turnbo is old and very feeble; she was in bed when witness passed her house on the day before this trial. Witness knew Jack Radcliff, but did not know his present whereabouts, nor did he know Radcliff's brand.

John Riggs next testified, for the State, that Mrs. Turnbo employed him to brand some stock for her in Williamson county about two years before this trial. Witness branded a six months old colt for her. This animal was a slim, black horse colt, with a white hind foot, white star in the forehead, and a nicked tail. Witness branded him thus: E. Since that time witness had frequently seen him on his range, and saw him on the day of this trial in charge of W. C. Turnbo. The original brand put on him by witness has been burned out, and that on him now looks like a B in a square.

A. M. Cobb was the first witness for the defendant. He testified that H. C. Cobb, the defendant, was his son. The witness lived, and for the last thirteen years had lived, near Florence, in

Williamson county, and his son, the defendant, lived near him. Jack Radcliff, the defendant's brother-in-law, remained at the defendant's house off and on throughout the whole summer, and during that time he has had horses which he claimed to own staked out in the neighborhood of defendant's house. Witness had often seen Radcliff with horses, which he watered at witness's tank. Witness saw a mare and the horse the defendant is charged with stealing at defendant's house in July. Radcliff claimed to own both of these animals. . Witness did not know the present whereabouts of Jack Radcliff, a fact which he deplores. Witness warned the defendant that "those fellows" would "land" him in the penitentiary if he tolerated their presence at his house, and implored him to have nothing to do with them.

Witness saw the defendant and Radcliff together about the first of August, just before they took the horses to Belton. Radcliff accompanied the defendant to Belton, when the mare and horse were sold by defendant, and was present in Belton when the sales were made. Defendant's name is Henry Clay Cobb, but he was called Clayton by many persons, and answers to the one name as readily as the other. Witness did not know where Radcliff got the horse, but the mare belonged to old man Caskey. Radcliff is not the son-in-law of witness, but is a brother to the defendant's wife. Witness heard Radcliff, about the first of August, tell defendant to take the mare and horse to Belton and sell them for him. He had the horse at defendant's house for a month before that time.

Lewis Pegram testified, for the defense, that he lived near the defendant in Williamson county. About the first of August, 1883, he saw the horse in question staked out near defendant's house, and heard Radcliff claim to own him. Radcliff had been in the neighborhood then about two months. Witness knew nothing more about him than that he was defendant's brother-in-law. One day while witness, defendant and Radcliff were riding through the woods together, witness heard Radcliff sell the horse to defendant. He offered to take twelve dollars for the horse, and defendant bought him. Witness saw no money or bill of sale pass, but heard the trade. Defendant goes by the name of Clayton, at home, and can neither read nor write.

J. T. Copeland testified, for the defense, that he knew the defendant. In the latter part of July, 1883, witness saw the horse in question at defendant's house. Radcliff claimed to own him.

Witness did not know Radcliff's present whereabouts, and knew nothing of a trade between him and defendant.

Mrs. Cobb, defendant's wife, testified, in his behalf, that in the latter part of July, 1883, at her house in Williamson county, she heard her brother, Jack Radcliff, sell the horse in question to the defendant. Radcliff also had a mare and colt which he claimed to be his own property. He kept them staked near old man Cobb's water tank. The trade spoken of was made in the house, with no one present but witness, defendant and Radcliff. Defendant paid Radcliff twenty dollars for the horse. Witness saw the money paid, but saw no bill of sale pass. Radcliff left defendant's house about the last of August, and witness did not know his present whereabouts.

The sufficiency of the evidence to sustain the conviction, and the correctness of the charge of the court, are questioned in the motion for new trial.

*Harris & Saunders,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.    1.  This appeal is from a conviction for theft of a horse, alleged in the indictment to have been the property of Louisa Turnbo. On the trial, it was proved by the State that Louisa Turnbo, the alleged owner, was an aged lady, in very feeble health, and not able to appear in court and testify in the case. It was further shown that W. C. Turnbo, her son, at the time of the alleged theft, was managing and controlling her business affairs, and attended to all sales and other dispositions of her stock, and that she did not dispose of any of her stock except through the agency of her said son, and that her said son had not consented to the taking of the alleged stolen horse by the defendant, or any one else.

Upon this element of the case, the want of consent of the owner, the charge of the court is full and explicit, and, in our opinion, correct. It instructed the jury that it devolved upon the State to prove satisfactorily, and beyond a reasonable doubt, that the horse was taken by the defendant without the consent of the owner, Louisa Turnbo, and without the consent of her son, W. C. Turnbo, but that such proof might be made by circumstantial evidence. It is contended by counsel for defendant that the want of consent on the part of Louisa Turnbo, the owner,

could not be established by circumstantial evidence. As a general rule, this proposition is correct. Circumstantial evidence should not be relied on by the State to prove the guilt of a defendant where direct testimony is attainable. But when it is shown, as in this case it was, that the direct testimony cannot be produced, and that the failure to produce it is not attributable to any want of diligence, or to any fault on the part of the prosecution, then it is perfectly competent and proper to resort to circumstantial evidence. (*Wilson* v. *The State*, 45 Texas, 76; *McMahon* v. *The State*, 1 Texas Ct. App., 102; *Welsh* v. *The State*, 3 Texas Ct. App., 422; *Foster* v. *The State*, 4 Texas Ct. App., 246; *Trafton* v. *The State*, 5 Texas Ct. App., 480; *Rains* v. *The State*, 7 Texas Ct. App., 588; *Jackson* v. *The State*, 7 Texas Ct. App., 363.)

It is further insisted by defendant's counsel that the evidence of the want of consent of the owner of the horse to the taking of the same is wholly insufficient to sustain the verdict, even if such evidence was competent. We think differently. We think the jury were fully warranted in concluding, from the testimony, that Louisa Turnbo never gave her consent to the taking of the horse.

2. The principal defense relied upon by defendant was that he had purchased the alleged stolen horse from one Radcliff, his brother-in-law, who had left the county, and whose residence was unknown. There was direct evidence proving this defense, and there was no positive evidence adduced by the State contradicting it. It was an issue fairly and directly raised by the testimony, and upon this issue the learned judge instructed the jury as follows: "In order to constitute the crime of theft, there must be a fraudulent taking, and if you believe, from the evidence, that defendant purchased said horse of one Radcliff in good faith, without any intent on his, defendant's, part to deprive the owner of the value of the same, then, in such case, the taking under such circumstances would not be fraudulent; and if you find that such purchase, if any, of said horse by defendant was honestly made, and was not a device to cover a fraudulent transaction, then you will acquit."

This charge was not excepted to at the trial, but special charges were asked by defendant and refused by the court which fully and correctly presented the law of this issue, and the charge given by the court is made a ground of defendant's motion for

new trial, as is also the refusal of the court to give the requested charges.

We are of the opinion that the portion of the charge which we have quoted is erroneous, and that the error is of such a character as might have operated to the injury of the defendant's rights. It was correct to instruct the jury that to constitute theft there must be a *fraudulent taking.* But it was not correct or consistent to say that if the defendant purchased the horse in good faith and honestly, that such *taking* would not be fraudulent; for a *purchase* is not a *taking* within the meaning of the statute defining theft. If he *purchased* the horse in good faith, or in bad faith, after the same had been *taken*—that is, stolen by another person—the purchase was not a *taking,* and could not be connected with the theft unless it were shown to be a mere sham to cover the fraudulent taking, and that defendant was in fact a party to such fraudulent taking. As was said by this court in *McAfee* v. *The State,* 14 Texas Court of Appeals, 668, " *There must be a taking,* and no subsequent connection with stolen property, be it in *good* or *bad* faith, honest or fraudulent, will constitute theft."

We think the court should have instructed the jury, upon this issue, that if the defendant purchased the horse from Radcliff after the same had been stolen by Radcliff, or by some other person than defendant, then they must acquit him. It was not a question of good faith or honesty in the purchase, but a question as to whether or not the defendant came into the possession of the horse after the same had been stolen, and without himself being a party to the theft. He might have known at the time he purchased the horse, if he did purchase him, that Radcliff had stolen him, and yet his purchase would not make him guilty of theft. To make him guilty of theft he must have been a party to the fraudulent taking. This subject has been fully discussed and the correct rule plainly enunciated in *McAfee* v. *The State, supra,* and also in *Parchman* v. *The State,* 2 Texas Court of Appeals, 228, and we deem it unnecessary to further elaborate it. (See also *Prator* v. *The State,* decided at present term, *post,* 363.)

Because of the error in the charge of the court, above noticed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 2, 1884.